We'll hear argument first this morning in Case No. 15-1293, Lee v. Tam. Mr. Stewart. Thank you, Mr. Chief Justice, and may it please the Court. The statutory provision at issue in this case, 15 U.S.C. 1052a, prohibits the registration of any mark that may disparage persons, institutions, beliefs, or national symbols. Based on that provision, the PTO denied Respondent's application to register the slants as a service mark for his band. The PTO's ruling did not limit Respondent's ability to use the mark in commerce or otherwise to engage in expression or debate on any subject he wishes. Because Section 52a's disparagement provision places a reasonable limit on access to a government program rather than a restriction on speech, it does not violate the First Amendment. Is copyright a government program? I think we would say copyright and copyright registration is a government program, but it's historically been much more tied to First Amendment values, to the incentivization of free expression. Kennedy. But in part, that seems to me to ignore the fact that we have a culture in which we have T-shirts and logos and rock bands and so forth that are expressing a point of view. They're using the market to express views. I mean, certainly it's as — because I was — Disparagement clearly wouldn't work with copyright, and — but that's a powerful, important government program. Let me say two or three things about that. First, there's no question that through their music, the slants are expressing views on social and political issues. They have a First Amendment right to do that. They're able to copyright their songs and get intellectual property protection that way. If Congress attempted to prohibit them either from having copyright protection or copyright registration on their music, that would pose a much more substantial First Amendment issue. But — More substantial First Amendment issue. I was somewhat surprised that in your brief you couldn't bring yourself to say that the government could not deny copyright protection to objectionable material. Are you willing to say that? I'm willing — I hate to give away any hypothetical statute without hearing the justification, but I'll come as close as I possibly can to saying, yes, we would give that away. It would be unconstitutional to deny copyright protection on that ground. But I would also say, even in the copyright context, we would distinguish between limits on copyright protection and restrictions on speech. For instance, it's historically been the case, and it remains the position of the Copyright Office, that a person can't copyright new words or short phrases, even if a person comes up with something that is original, that is pithy, that makes a point. If it's too short, you can't get copyright protection. We would certainly defend the constitutionality of that traditional limit on the scope of copyrightable material. And if there were a First Amendment challenge brought, we would argue that there's a fundamental distinction between saying you can't copyright a four-word phrase and saying you can't say the four-word phrase or you can't write it in print. Those are the differences. Ginsburg-Miller There's a significant difference between the copyright regime. You can't sue for copyright infringement unless you register. Isn't that so? Stewart You have to have filed an application to register in order to pursue an infringement suit. And so the statute, I believe it's 17 U.S.C. 411a, indicates that if you filed an application to register your copyright, even if that application has been denied, you can still bring your copyright suit and the register is entitled to be heard on questions of copyrightability. Ginsburg-Miller There's no comparable restriction on the trademark. Stewart That's correct. You can file a suit under Section 1125a of Title 15 under the trademark laws, either for infringement of an unregistered trademark or for unfair competition more generally. Roberts I'm concerned that your government program argument is circular. The claim is you're not registering my mark because it's disparaging, and your answer is, well, we run a program that doesn't include disparaging trademarks, so that's why you're excluded. It doesn't seem to me to advance the argument very much. Stewart Well, I think the disparagement provision is only one of a number of restrictions on trademark registrability that really couldn't be placed on speech itself. For example, words, marks that are merely descriptive, that are generic, marks as to which the applicant is not the true owner because somebody else was previously using the mark in commerce, those can't be registered either. Breyer Well, each of those, and I know there are several, are related to the ultimate purpose of the trademark, which is to identify the source of the product. So every trademark makes that statement. Now, what is what purpose or objective of trademark protection? Does this particular disparagement provision help along or further? And I'm thinking of the provision that says you can say something nice about a minority group, but you can't say something bad about them. With all the others, I know the others. I don't know all, but I know many of them. And I can relate that. You relate this. Stewart I think Congress evidently concluded that disparaging trademarks would hinder commercial development in the following way. A trademark in and of itself is simply a source identifier. Its function is to tell the public from whom do the goods or services emanate. It is not expressive in its own right. Now, it is certainly true that many commercial actors will attempt to devise trademarks that not only identify them as the source, but that also are intended to convey positive messages about their products. For example, if you see the name Jiffy Lube or a B&B that's called Piney Vista, the mark is sort of a dual-purpose communication. It both identifies the source and it serves as a kind of miniature advertisement. There is always the danger, as some of the amicus briefs on our side point out, that when a person uses as his mark words that have other meanings and common discourse, that it will distract the consumer from the intended purpose of the trademark qua trademark, which is to identify source. And basically, Congress says, as long as you are promoting your own product, saying nice things about people, we'll put up with that level of distraction. Ginsburg. So suppose the application here had been for slants are superior. So that's a complementary term. Would that then take it outside the disparagement bar? I think that under the PTO's historical practice, probably not. And I think the same thing would be true of other racial epithets, terms that have long been used as slurs for particular minority groups. Why isn't that disparaging of everyone else? Slants are superior. Well, superior to whom? I think the basis for the PTO's practice, and we obviously don't have that case, is that the term slants in and of itself when used in relation to Asian Americans. I have it right. Breyer. I want to get the answer to my question, because that is the one question I have for you. The only question I have for you is what purpose related to trademark's objective does this serve? And I want to be sure I have your answer. Your answer so far was it prevents the or it helps to prevent the user of the product from being distracted from the basic message, which is I made this product. I take it that's your answer. And if that's your answer, I will my follow-up question to that would be, I can think probably, and with my law clerks perhaps, 50,000 examples of instances where the space that trademark provides is used for very distracting messages, probably as much or less or more so than the one at issue, or disparagement. And what business does Congress have picking out this one, but letting all the other distractions exist? Well, I think what you've described is my first-line answer. And I think the precise justification for different kinds of, for prohibiting registration of different kinds of disparaging trademarks would depend to some extent on who is being disparaged. That is, in the disparaging, your answer was distracting. And one of the great things of 99 percent of all trademarks is they don't just identify, boy, do they distract. It's a form of advertising. So if the answer is distracting, not you didn't provide an answer to disparagement. Your answer to why disparagement was they don't want distraction from the message. They don't want distraction and they don't want particular types of distraction. That is, when we're dealing with That's where I have the question. What relation is there to the particular type of distraction, disparagement, and any purpose of a trademark? The type of distraction that may be caused by a disparaging trademark will depend significantly on the precise type of disparagement at issue. That is, in the case of racial epithets, these words are known to cause harm, to cause controversy. In some sense, they may be no more distracting than a positive message, but Congress can determine this is the wrong kind of distraction. Another type would be a competing soft drink manufacturer who wants to register the trademark Coke Stinks, who wants to identify his own product with a sentiment that is antithetical to one of his competitors. Congress can determine we would prefer not to encourage that form of commerce. We can prefer to, that commercial actors will promote their own products rather than disparage others. Obviously, under the First Amendment, we couldn't prevent that kind of criticism, but we can decline to encourage it. I'm sorry. Assuming government speech itself is not involved, I always thought that government programs were subject to one extremely important constraint, which is that they can't make distinctions based on viewpoint. So why isn't this doing exactly that? Because it precludes disparagement of all of them, and it casts a wide net. Yes, well, that's absolutely true. It precludes disparagement of Democrats and Republicans alike and so forth and so on. But it makes a very important distinction, which is that you can say good things about some person or group, but you can't say bad things about some person or group. So, for example, let's say that I wanted a mark that expressed the idea that all politicians are corrupt or just that Democrats are corrupt. Either way, it doesn't matter. I couldn't get that mark, even though I could get a mark saying that all politicians are virtuous or that all Democrats are virtuous. Either way, it doesn't matter. You see the point. The point is that I can say good things about something, but I can't say bad things about something. And I would have thought that that was a fairly classic case of viewpoint discrimination. Well, as we pointed out on our brief, laws like libel laws have not historically been treated as discriminating based on viewpoint, even though they say that. Well, that's libel is in one of our historically different but very distinct categories. And you don't make the claim that this falls into a category of low-value speech in the way that libel laws, in the way that defamation does or fighting words or something like that. And you're not looking to create a new category. So in that case, it seems that the viewpoint-based ban applies. And this, as I said, I would be interested to hear your answer of why the example that I stated is not viewpoint-based. It says you can say something bad about, you can say something good about somebody, but not something bad about somebody or something. Well, certainly if you singled out a particular category of people like political officials and said you can't say anything bad about any of them, but you can say all the good things you want, I think that would be viewpoint-based because it would be protected, a discrete group of people. Let me just give a couple of other answers. But why isn't that this? But if you didn't limit it, if you said you can't say anything bad about anybody anytime, that's okay? Again, we're not saying you can't say anything bad. We're saying we don't register your trademark if it is disparaging. Certainly you can't say anything bad about anybody. No, no, no, I said even in a government program, even assuming that this is not just a classic speech restriction, you're still subject to the constraint that you can't discriminate on the basis of viewpoint. Well, in Boose v. Berry, it's not a majority opinion, but the Court there was confronted with a law that made it illegal to, I believe it was post signs or engage in expressive activity within 500 feet of a foreign embassy that was intended to bring the foreign government into contempt or disrepute. And the law was struck down as sweeping too broadly. But at least the plurality would have held that it was not viewpoint-based because it applied to all foreign embassies. It didn't turn on the nature of the criticism. Another example I would give, and it's a hypothetical example, but at least I have a strong instinct as to how the case should be decided. Suppose at a public university, the school set aside a particular room where students could post messages on topics that were of interest or concern to them as a way of promoting debate in a non-confrontational way. And the school said, just two ground rules, no racial epithets and no personal contact with other members of the school community. It would seem extraordinary to say that's a viewpoint-based distinction that can't stand because you're allowed to say complementary things about your fellow students. So the government is the omnipresent school teacher? I mean, is that what you're saying? No. The government's a school teacher? No. Again, that analysis would apply only if the public school was setting aside a room in its own facility. Clearly, if the government attempted more broadly to restrict disparaging speech by students or others, rather than simply to limit the terms under which a forum for communication could be made available, that would involve entirely different questions. That's why the plurality in Booth v. Berry would have found the law unconstitutional even though they found it not to be viewpoint-based. Robertson, But one distinction is the scope of the government program. If you're talking about a particular discussion venue at a public university, that's one thing. If you're talking about the entire trademark program, it seems to me to be something else. Well, the trademark registration program and trademarks generally have not historically served as vehicles for expression. That is, the Lanham Act defines trademark and service mark purely by reference to their source identification functions. And I think it's, to get back to copyright for just a second, I think it's at least noteworthy that everyone would recognize that Mr. Tam is not entitled to a copyright on the slants. The Copyright Office doesn't register short phrases. Two words is certainly short, especially when one of them is. Ginsburg. It's not because of the content or the viewpoint expressed. It's just it's a short phrase, and any short phrase would be no good. This is, you can't say slants because the PTO thinks that's a bad word. Does it not count at all that everyone knows that the slants is using this term, not at all to disparage, but simply to describe? I think it is. To take the sting out of the word. Well, the trademark examining attorney went through this in a lot of detail. And the trademark examiner acknowledged that Mr. Tam's sincere intent appeared to be to reclaim the word, to use it as a symbol of Asian American pride, rather than to use it as a slur. He also found a lot of evidence in the form of Internet commentary to the effect that many Asian Americans, even those who recognized that this was Mr. Tam's intent, still found the use of the word as a band name offensive. The point I was trying to make about copyright is, is not that copyright protection would be denied on the ground of disparagement. You're right, it would be denied because it's a short phrase and not even an original phrase. But copyright is kind of the branch of intellectual property law that is specifically intended to foster free expression on matters of cultural and political, among other significance. Alito, do you deny that trademarks are used for expressive purposes? I don't deny that trademarks are used for expressive purposes. As I was saying earlier, I think many commercial actors will pick a mark that will not only serve as a source identifier, but that will cast their products in an attractive light and or that will communicate a message on some other topic. My only point is, in deciding whether a particular trademark should be registered, Congress is entitled to focus exclusively on the source identification  Alito, I wonder if you were not stretching this, the concept of a government program, past the breaking point. The government provides lots of services to the general public, and I don't think you would say that those fall within the government program line of cases that you're talking about, like providing police protection to the general public or providing fire protection to the general public. Those cost money, and those are government programs. Can the government say, well, we're going to provide protection for some groups, but not for other groups? No, I think those would raise serious, I mean, depending on the nature of the distinction, equal protection problems, potential First Amendment problems. But potential First Amendment problems, too, if the nature of the distinction was based on the person's speech, isn't that right? Well, certainly, I mean, clearly if it was based on viewpoint, and clearly, I would say if the ---- So absolutely clearly if it was based on viewpoint. And so I guess I don't want to interrupt your answer to Justice Alito, but I want to get back to, because I don't really understand the answer that you gave me before. You said a government regulation that distinguished between saying politicians are good and virtuous and politicians are corrupt would clearly be viewpoint-based. Is that right? Right. And similarly, if you said that the flag is a wonderful emblem, this applies to national symbols, but you could say that the flag is a wonderful emblem, but you can't say that the flag is a terrible emblem. That would be viewpoint-based. Well ---- I mean, that's what this regulation does. If you're talking ---- It says you can say one of those things, but you can't say the other and get trademark. But it sweeps with a broad brush, and I think the reason that viewpoint-based discrimination has historically been the most disfavored type of regulation from a First Amendment perspective is that it creates the danger that the government is attempting to suppress disfavored messages. I mean, there was a TTAB, a Trademark Trial and Appeal Board decision from 1969 that declined to register a proposed trademark that was essentially the Soviet hammer and sickle with a slash through it, and registration was denied on the ground that it disparaged the national symbol of the Soviet Union. Now, obviously, hostility towards the Soviet Union was not inconsistent with United States policy in 1969. No one would have perceived the denial of trademark registration as an attempt to suppress a disfavored viewpoint, and the point of the statute ---- the point of my defense of the statute is it casts ---- it sweeps with such a broad brush. But that's like saying it does so much viewpoint-based discrimination that it becomes all right. But it does so ---- I mean, it imposes this restriction only within the confines of a government program. And the ---- Yes, yes, and I'm willing to give you that. But even government programs, again, assuming it's not government speech itself, even government programs are subject to this constraint, which is that you can't distinguish based on the viewpoint of a speaker. Well, part of this government program is government speech. And let me just describe the two types of basic services that the PTO performs in the course of administering the program. First, when an application is filed, the examining attorney and potentially the Trademark Trial and Appeal Board will go through it to see whether the applicant satisfies the statutory prerequisites to registration. And some of those, like 1052a, are not essential to having a valid trademark. But many of the prerequisites to registration overlap with the prerequisites to having a valid trademark. And so when the examining attorney decides is this merely descriptive, is it generic, does it serve as a mark that consumers will associate with the product in commerce, is this person the true owner of the mark, the examining attorney is deciding the same sorts of questions that could arise in an infringement suit if the applicant ever filed one. And therefore ---- Ginsburg. That's another one. Scandalous or immoral. Those are just like disparage. They block you from registering the mark, right? They do block you from registering the mark, not from filing an infringement suit or alleging unfair competition. But that's the same thing. That's the same thing as disparagement. I was just saying many of the other statutory prerequisites do overlap with the prerequisites to having a valid trademark. And so if the examining attorney approves the application, he is giving the applicant at least some comfort that he can continue to use the mark in commerce with a degree of confidence that if somebody else infringes the mark, he will be able to satisfy the prerequisites. Roberts. Running the Federal courts is a government program. Can you say that the courts, when it comes to trademarks, the courts are not open for actions to enforce infringement of a disparaging trademark? I mean, if Congress had taken to its furthest possible step the desire to disassociate the Federal government from the enforcement of these marks. Yes, that was how the hypothetical was framed, the furthest possible step. But it's the same do you apply the same analysis you do simply with the, as in this case, the PTO in defining the government program. I think we would typically think of the PTO's exercise of discretionary authority and as the exercise of discretionary authority by an executive branch agency as different from the neutral enforcement of the law by the courts. Obviously, Congress can't do that. Kennedy, if it's a government program, can you do anything you want with speech? Or what are the restrictions that we can't? Is it intermediate? You don't argue that this statute meets strict scrutiny? I take it you don't. No. I think the basic test would be is it reasonably related to the objectives of the government program. And in cases of viewpoint discrimination, in cases where the program raises the concern that the government is attempting to promote disfavored messages and suppress disfavored messages, the program would be presumptively unconstitutional. The second form of service that the PTO provides in the course of administering the program is that if it decides the trademark should be registered, it publishes the trademark on the Federal Register. And publication is significant in a variety of ways. First, outside the context of legal suits, publication of the trademark on the Federal Register, any infringement will occur, because it provides notice to potential competitors in commerce that the PTO has approved this mark. It will give them an incentive to choose marks that are not confusingly similar. Second of all, it would be important to me, because your time is running, the questions have concentrated on viewpoint discrimination, but there's also a large concern with vagueness here and the list that we have of things that were trademarked and things that weren't. Take, for example, one had the word hebe, and that was okay in one application and it was not okay in another. Stewart. First, if the Court accepts our basic theory that this should be judged by the standards that typically apply to government benefits under a government program, although the statute doesn't draw an entirely bright line, it's sufficiently clear. The Court has approved, for instance, the criteria for awarding NEA grants that were at issue in Finley to the effect that the grant givers should take account of the diverse views and beliefs of the American public. The trademark — the PTO receives 300,000 trademark applications every year, so it's not surprising that there is some potential inconsistency. And the other thing I would — the other two things I would say are, first — Sotomayor, isn't there another way to say it's not clear enough for them to get it right? Stewart. It's not a bright-line rule. I would say two things, two further things before I sit down. The first is that I think a lot of the examples that the PTO has had trouble with and where it may — there may be an appearance and perhaps the fact of inconsistent decisions are instances where people are deliberately using terms that have historically been insulting, but with the intent to be edgy, provocative, to reclaim the slur. This is entirely legitimate, but when people self-consciously use words in a way other than they have traditionally been used, it's not surprising that sometimes they're misunderstood. The second thing I'd say is the examples that the other side gives are — raise the concern that the PTO might have approved some trademarks that it shouldn't have approved, but they really haven't identified any examples of marks that were rejected as disparaging, even though no reasonable person could view them as such. If I may, I'd like to preserve the balance of my time. Roberts. Thank you, counsel. Mr. Connell. Thank you, Mr. Chief Justice, and may it please the Court. If our client, Mr. Simon Tam, had sought to register the mark of his band as the slants, suppose he had this hypothetical case, the facts are largely parallel to these, other than the band are non-Asians, they use makeup to exaggerate slanted eyes, and they make fun of Asians. Could the government, under a properly drawn statute, decline to register that as a trademark in your view? They could not. The First Amendment protects absolutely outrageous speech insofar as trademarks are concerned. That is correct. I think you have to take that position. Well, we take that position because — Because marks constitute both commercial speech and noncommercial speech, and the Disparagement Clause specifically targets the noncommercial speech and denies registration to marks that only express negative views. But I have a question. But in your view, the Congress could not draw a statute even different to make the distinction that the hypotheticals points out, and the Congress, in your view, can draw no statute denying trademark protection in the hypothetical case. I cannot think of a circumstance under which that could occur. Then I have a question for you. This is a bit different than most cases. No one is stopping your client from calling itself the slants. No one is stopping them from advertising themselves that way or signing contracts that way or engaging in any activity except that of stopping someone else from using the same trademark. But even that they could do, because you don't need a registered trademark to sue under the Latinamax entitlement for the confusion of the public in the use of any kind of registered or unregistered mark. If you — if another band called themselves slants, they would be subject to deceptive advertisements because they wouldn't be this slant. So there is a big difference. You are asking the government to endorse your name to the extent of protecting it in a way that it chooses not to. So it — there is a reason why the argument is appealing. And why shouldn't we consider it in those ways when your speech is not being burdened in any traditional way? The registration program, the regulatory system of trademark registration is widely available to a broad number of markholders who seek the legal protections of registration. In this case, the government has used the Disparagement Clause to selectively deny those legal benefits to a markholder expressing negative views that the government favors, as opposed to markholders who receive those benefits because they express neutral or positive views that the government does favor. Sotomayor, it doesn't answer my question. You can still use your name. Why is it a burden? It is a burden because our client is denied the benefits of legal protections that are necessary for him to compete in the marketplace with another band. And the only reason for the denial of those benefits is the burden on his noncommercial speech contained in the mark. He can still sue. He can still — He can still compete. He can still compete, but he can't — But it's just he's not getting as much as he would like, but he's not stopped from doing what he's doing. He could still — his only resort at that point would be to seek the protection of — or to assert his right to exclusive use of the mark under Section 43 or State Trademark Law or Common Law, none of which have the extensive and substantial benefits that this Court has recognized under trademark registration. It seems to me — I mean, does your argument depend upon the breadth of the government program? I mean, let's say you had a government program putting on a festival or a lecture series. We only want pro-Shakespeare presentations. It's about celebrating Shakespeare. And if you disparage Shakespeare, you can't participate. Is there anything wrong with that? I don't believe there is in that limited forum that that would make a difference. But this is not that case. This is a widely available program that's made — that all comers can utilize. Well, but no, it's not. If you have a disparaging trademark, you can't utilize it. Except, again, that targets the noncommercial aspect of speech, which has nothing to do with the commercial objectives of the Lanham Act. Well, I guess I don't understand yet your distinction why the only celebrating Shakespeare program is okay, but the trademark one is not. You can't disparage Shakespeare. You can't have disparagement marks about anybody in the trademark context. Is it just the comprehensive nature of the government program? In this case, it is. Why does that matter? Yeah. I mean, maybe the government just decides we want to celebrate everything. We want to be relentlessly positive. And, Justice Kagan, that goes back to your point before, that that would — would discriminate against any negative viewpoints and only arm one side of the debate in this case. No, but it isn't quite like that. After all, as Justice Sotomayor pointed out, this is more like a single bulletin board on the train station, a train station which has 1,000 bulletin boards. People can say whatever they want. But this bulletin board, one out of 1,000, is reserved today for people who want to say nice things about Shakespeare. This is not a general expression program. This is a program that has one objective. The objective is to identify the source of the product. It stops nobody from saying anything. All it says is, when you're trying to fulfill our objective, which is to identify the source of your product, if you want, put a little circle with an R in it and write down beneath in tiny letters, Mr. and Mrs. Smith, anything you want, but in that circle, not the thing that says the insulting thing about somebody else. See? Very much like one Shakespeare celebration board out of a million. Or let me say 10 million to make the point stronger. You see? That's — that's where you can't express yourself. So — and I said to them, well, why do you do that? And they said, because, you know, the purpose of a — of a trademark is to identify a source. It's not to get people into extraneous arguments. And what this will do is it will get people into extraneous arguments, losing or diluting the force of a program that seeks to use a trademark to identify a source. Now, that's what I got out of my answer to the last question on the other side. And I would like to know what you think. Actually, I think the government's position is such that — Well, I don't care what their position is. I want to know what you think in respect to the question I'm asking. Well, I think what the government's trying to do here is simply encourage commercial actors to conduct business in such a way as to not insult customers. No, not conduct business. They can insult customers. Boy, you could have 50,000 insults on every physical item that you put out. All you cannot do is when it comes to a little mark or a form of words that is designed to say one thing. I'm repeating myself. I am the source of the product. And you can do that in little letters, big letters, tiny letters, no letter, whatever. But there, you have to stick to business. And if you're going to go beyond business, don't use insults. Do you believe that they could stop trademarks from saying, this is the trademark you can't use, Joe Jones is a jerk? They could not stop. They could not stop that. They can't. Can they say, Smith's beer is poison? They could not. Oh, my goodness. I mean, there are laws all over the place that stop you from saying that a competitor is has bad products. It's called product disparagement. There are laws all over the place that stop you from saying Joe Jones is a jerk or something more specific. They're called libel laws or slander laws. But you're saying the government couldn't do that? The government cannot burden the noncommercial aspect of the mark, and that's what they would be doing in that case. Ginsburg-How about saying you cannot trademark a slogan that has one of George Collins' seven dirty words in it? If you were going to use one of those seven words, we won't register your trademark. Schnapper I think that is a burden on speech. In fact, I think if the phrase that was used in Cohen v. California was trademarked, there's no question that there would be a burden on the noncommercial aspect of that mark. Ginsburg-Howe Can I go back? Ginsburg-Howe What you do with this Court's specific decision, which said it was okay to ban those words from the airwaves. Schnapper Well, I can't. Ginsburg-Howe Ban. Now, this is not yeah, you can have trademark protection, but we're not going to let you get the extra benefits of registration. Because you can't use those words on the air, and this Court upheld it. Schnapper Yeah. Pacifica actually simply was limited to time, place, and manner restrictions. The Court expressly said that they were not banning the use of those words. And in addition, Pacifica did say that notwithstanding the content restrictions imposed on those words, the fact of the matter was that if the restrictions were motivated by a negative view of the ideological or political message being conveyed, that would be unconstitutional. Breyer I'm sure there is. Breyer To the time, place, or manner, there is time, place, or manner. In fact, you can use these words anywhere, at any time in your performance. Just don't use them as the registered source of the message, I am the owner of the band. Time, place, and manner, you have the entire universe where you can say what you want, including this. So why is this somehow not a restriction on time, place, and manner, if the others were? Because, again, I come back to the fact that this is a burden on the noncommercial aspect of the mark. Sotomayor How do you? Sotomayor Let's go back to, if we can, the earlier part of Justice Breyer's question. 1052 has two components. You can't disparage or falsely suggest a connection with a person, institution. Are you challenging or saying that the second part of 1052, falsely suggest a connection, is unconstitutional as well? Breyer That's not the question before this Court. Sotomayor I don't, but your argument earlier was that if someone slanders or libels an individual by saying Trump before he was a public figure, Trump is a thief, and that becomes their trademark. Even if they go to court and prove that that's a libel or a slander, that trademark would still exist and would be capable of use, because otherwise canceling it would be an abridgment of the First Amendment? Breyer I believe that's correct. Sotomayor That makes the line. Alito Well, Mr. Connell, don't you think that Congress could deny trademark registration for something that fit within the narrow historically recognized category of libel and slander, which have never been regarded as having First Amendment protection? Connell I think the outer limit of the protection here are the categories of historically prescribed speech. That would include threats, it would include fraud, things such as that. That's not the case, obviously, with the mark that we're using here. Kagan Well, one of the things, Mr. Connell, that troubles me about this case is that it's not quite as simple as just saying, well, here's a government program and the government is discriminating on the basis of viewpoint, because there are aspects of this program that seem like government speech itself. Maybe not quite that, but something approaching it, which is the program says that anything that's registered, the government publishes in its own publication. The government sends to foreign countries, again, in its own publication. So the whole program is geared in such a way that individual marks that are registered end up being, I doubt anybody would ascribe them to the government, but the government republishes them, communicates them, and so forth. And doesn't that aspect of the program give the government greater leeway here than it would in a typical program in which no government speech itself is involved? Connell It does not. The register simply serves as a recordation of the marks that the government has approved according to the statutory criteria. This is in no way different than copyright registration, patent registration, marriage license registration, car registrations, any other kind of typical government registrations that are simply ministerial. The government is not speaking. It's not its message. The control over the creation and design of the mark is retained at all times by the owner. There is no history here of the government using marks to speak through private mark holders, and there's no association with the government and the mark itself. Ginsburg But doesn't the government have some interest in disassociating itself from racial, ethnic slurs? I mean, what about the license, Texas license, vanity license plate, and they said they won't do one with the Confederate flag? Connell That was specifically a government speech case. That's not our case here. This is not a government ID issued on government property, controlled by the government as to design and content and so on. In fact, it's exactly the opposite. Roberts You've said several times that the problem is that the government is burdening noncommercial, the noncommercial aspects of the trademark. But it seems to me that that's an awfully blurry line. A lot of these trademarks promote the commercial aspect, in fact, by disparaging other groups. And they figure that's a way to promote sales. How do you tell the difference between the commercial aspect of the trademark and the noncommercial aspect? Connell The commercial aspect is that part of the mark that simply identifies the source of the good or service in question. In the case of the slants, there's another component, that being the noncommercial, which communicates the political and social message of Asian pride. This is akin to Justice Breyer before talking about the inherent advertisement that can take place. Bands don't exist without names, and people associate the music with the band name and the band name with the music that they perform. So that is where the noncommercial aspect of the speech comes in. And to the extent that the government is burdening it by denying registration because they believe that it conveys a negative view, that's unconstitutional. Kennedy You want us to say that trademark law is just like a public park. A public park, a public forum. The classic example of where you can say anything you want, we treat this, we treat trademarks just like we treat speech in a public park. Thank you very much. Good-bye. That's it. That's your argument. Verrilli, It is my argument. I think the limitation on that, as I said before, are the categories of historically prescribable speech. Kagan Well, Mr. Connell, that just can't be right, because think of all the other things, the other, I mean, I'll call them content distinctions because they are. The trademark law just makes. I mean, Section 2 prohibits the registration of any mark that's falsely suggestive of a connection with persons, likely to cause confusion, descriptive, misdescriptive, functional, a geographic indication for wine or spirits, government insignia, a living person's name, portrait, or signature. You couldn't make any of those distinctions in a public park. And yet, of course you can make them in trademark law, can't you? Verrilli, All of those other distinctions are viewpoint neutral and advance the commercial objectives of the Lanham Act in terms of reducing consumer confusion. Kagan Well, these might be viewpoint neutral, but they are certainly not content neutral, and yet we would, I mean, I think that a challenge to many of these would fall flat. Verrilli, On what basis? Kagan Because, like, how is trademark law supposed to function unless it can make these kinds of distinctions? Verrilli, I'm suggesting that those sections would survive. Section B. Kagan Yes, well, okay, if those would survive, then this is not a public park because those would not survive in a public park. Verrilli, Agreed. Kagan There's something different here, in other words, that this is coming up in the government program, which provides certain benefits that the government doesn't have to provide at all. Verrilli, The point here is that the government program, at least the goals of the Lanham Act, are to reduce consumer confusion, and that is a legitimate interest that the government has, and these factors under 1052 advance that purpose.  neutral. aspect of a trademark. Let me give you an example. I think that Nike's phrase, just do it, is a registered trademark. Now, is that commercial or is that expressive? Verrilli, It is both. The two are intertwined. Just like with the slants, where you have the source identifier that is inextricably intertwined with the message that the mark is conveying about the source or about the goods and services identified. Alito Well, if they're inextricably intertwined, then I don't understand how we can separate them and apply to the expressive part a more rigorous test than we would apply to the commercial part. Verrilli, I'm not sure I understand your question. Alito Do you think that viewpoint discrimination is always prohibited in commercial speech? For example, could the government say, and maybe it already has said, that a manufacturer of cigarettes could not place on a package of cigarettes, great for your health, don't believe the surgeon general. Verrilli, Viewpoint discrimination is prohibited in commercial speech, no question under the Sorrell case. Breyer, It's back to really the Chief Justice's question. I wouldn't ask it if I think, except that I think you do have something of an answer that you haven't fully expressed. Look, we're creating through government a form of a property right, a certain form. That's a trademark. It's as if through government we created a certain kind of physical property right that certain people could dedicate a small part of their houses or land to Peaceful Grove. And in Peaceful Grove you write messages, but peaceful messages. And above all, you don't write messages that will provoke others to violence or bad feelings. Okay? Anything wrong with that? I can't think of anything wrong with that. There are thousands of places where they can express hostile feelings. It's just in this tiny place, one quarter of an acre, that you yourself have chosen to take advantage of. But you can't, because it will destroy the purpose. It will destroy the purpose of Peaceful Grove. That's why I asked my question. To what extent does interfering with viewpoints here serve a trademark-related purpose? As we can see how in Peaceful Grove or in Shakespeare, the messages that we were talking about did harm the government purpose. And here they are saying, similarly, disparaging messages get in the way of the objective of this program, which is to identify the source. Now, that, I think, is what I heard. That's what I'd like you to think about and respond to. Disparaging messages in trademark do not interfere with the source. They simply control the other component of the message. The slants is the band. It's clearly identified. So the identification of the source of the service, the music in question, is served by the mark. What the government objects to is the other message. It's the other message. Breyer. I understand that. But now your answer, okay, I've got your answer. And now your other answers were worrying me. Because what's worrying me is I accept what you just said, suppose I did. Am I suddenly saying, no Peaceful Grove, no Shakespeare celebration, no normal restrictions on normal restrictions, you know, it's functional, can't have functional things in a trademark, da, da, da, all the ones we read. If I buy into your answer just that you just gave, have I suddenly opened the door to striking down all those things? No, I don't think so, because the purpose, as you said, Your Honor, of Peaceful Grove was to have a place of seclusion, of solitude, of calm. That's completely different than the trademark regime, which is open to all comers and which simply is trying to advance the goal of source identification. And if the markholder wishes to include a component in the mark to somehow advertise the good, the service, to convey a different message, that doesn't get in the way of the source identification. Roberts Well, but it seems to me that you're defining the government program differently than the government would. I think they're suggesting that there's more to their program than just source identification. That is not clear at all in the Lanham Act. In fact, the only purposes of the Lanham Act, as identified by this Court in Park and Fly, and this was a citation to, I believe, the Senate report, was the reduction of consumer confusion and the protection of the goodwill of the markholder. There was no suggestion that this was a politeness statute. Roberts Well, we heard from Mr. Stewart that they thought the disparagement aspect would distract from the commercial identification. I think that's what he said. And you're saying that's not really their purpose, or? Verrilli, Well, I'll say that that's nowhere in the legislative history and that's not in the legislation itself. I mean, that seems to be pulled out of thin air by the government, who, again, in their brief, talks about reducing the level of insult or the occasion of insult to customers. That's not part of the Lanham Act. That's not part of the commercial purpose of the Lanham Act. Ginsburg Would you say the same thing about a scandalous mark? Would that be equally impermissible? Verrilli, I think that conclusion is inevitable. If there are no further questions. Roberts Thank you, counsel. Verrilli, Thank you. Roberts Mr. Stewart, two minutes. Stewart Thank you, Mr. Chief Justice. Let me make three quick points. Mr. Connell has said that the government registration program regulates only the expressive and not the commercial aspect of the mark. And I think that's getting it exactly backwards. Mr. Tam wants to do two things with the mark, the slants. He wants to use the mark himself in relation to his band, and he wants to be able to sue other people who use it in a way that would cause him commercial harm. And denial of registration affects only the second thing. It places no restrictions on his ability to use the mark. It may limit the remedies that are available for infringement, but that's entirely regulating the commercial aspects of the conduct. The second thing is, Mr. Connell's position clearly is that the test for constitutionality of a registration condition is, could the government ban this speech altogether? And putting that in place would eviscerate the trademark registration program. Most obviously, as Justice Kagan has pointed out, there are a lot of other content-based registration criteria. And in addition, I'd point out one of the prerequisites to registration is that you'd be using the mark in commerce. If this were truly a suppression of speech, we'd ask, by what authority could the government make the right to speak contingent on providing goods and services in commerce? Finally, Justice Kagan, you mentioned commercial speech. And there is an important government communicative aspect to this program. The preparation of the principal register is not just an ancillary consequence of this program. It's the whole point, to provide a list of trademarks so other people know what has been approved, what's off limits. And the consequence of Mr. Connell's position is that the government would have to place on the principal register, communicate to foreign countries the vilest racial epithets, insulting caricatures of venerated religious figures. The test for whether the government has to do that can't be coextensive with the test for whether private people can engage in that form of expression. Alito, you really think that speech can be restricted by the government on the ground that foreign countries may object to it? Could the government do that with copyright? I think an awful lot of things are copyrighted in this country that are deeply offensive to some foreign countries, and yet the FBI enforces the copyright laws. I would agree that copyright is different. It's historically played a far more fundamental role in free expression than trademark law has played. But the government, at the very least, has a significant interest in not incorporating into its own communications words and symbols that the public and foreign countries will find offensive. Thank you, counsel. Case is submitted.